## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

JOSEPH H.,                                   )
                                             )
                  Plaintiff,                 )
                                             )       No. 17 C 50353
        v.                                   )
                                             )       Judge Sara L. Ellis
ANDREW SAUL, Commissioner of Social          )
Security Administration,[1]                  )
                                             )
                  Defendant.                 )

## OPINION AND ORDER

Plaintiff Joseph H. seeks to reverse the final decision of the Commissioner of the Social

Security Administration denying his application for disability insurance benefits ("DIB") under

Title II of the Social Security Act, 42 U.S.C. § 416(i), 423. Both parties have moved for

summary judgment. Because the Court concludes that the Administrative Law Judge ("ALJ")

erred in her evaluation of the opinions of Joseph H.'s treating health professionals, the Court

reverses the ALJ's decision and remands this case to the Social Security Administration for

further proceedings consistent with this Opinion.

## BACKGROUND

### I.      Procedural History

Born in 1969, Joseph H. worked as a mason worker from 1990 to February 27, 2013. AR

83–84. Sidelined from his job because of increasing back pain, he filed a claim for DIB on April

1, 2014, claiming he suffered from osteoarthritis, degenerative disc disease L5-S1, disc

protrusion L5-S1, lumbar radiculopathy, depression, and anxiety. AR 162, 187. The agency

initially denied his claims on August 4, 2014, and again on reconsideration on March 31, 2015.

---

[1] The Court substitutes Andrew Saul for Nancy Berryhill as the proper defendant in this action. Fed. R.
Civ. P. 25(d).

AR 10.  Joseph H. requested a hearing, which the ALJ held on October 20, 2016, and at which

Joseph H. had counsel.  AR 10.  On January 13, 2017, the ALJ issued her decision, finding that

Joseph H. is not disabled.  AR 10–27.  The Appeals Council denied review on September 18,

2017, AR 1–3, making the ALJ's decision the final decision of the Commissioner.

## II.     Relevant Medical History

### A.     Physical Impairments

Before stopping work in 2013, Joseph H. saw Dr. Craig Popp in November 2011,

complaining of worsening back and bilateral leg pain.  AR 427.  An x-ray showed almost

complete loss of disc height at the L5-S1 level, AR 429, and an MRI showed considerable

degenerative changes at the L5-S1 level, AR 424–26.  On January 5, 2012, Dr. Popp assessed

that Joseph H. had a lumbosacral strain and degenerative arthritis.  AR 422–23.  Dr. Popp

continued to treat Joseph H., prescribing him medication for pain and muscle spasms and

recommending physical therapy.  AR 359, 362, 424.

On February 28, 2013, Dr. Popp's notes record that Joseph H. complained not only of

back pain but also of anxiety, recurrent panic attacks, and depression.  AR 311.  Dr. Popp

determined that surgery would not allow Joseph H. to return to his prior level of function but

that, with some modifications, he might be capable of a medium workload.  AR 312.  On March

21, Joseph H. had an MRI of his lumbar spine, which showed L2-L3 and L5-S1 disc

degeneration, as well as a lateral recess spur and disc bulge putting pressure on the S1 nerve root

on the right side.  AR 299–300, 316.  Dr. Popp opined that this made a heavy labor type job

unreasonable.  AR 316.

Joseph H. then saw Dr. Christopher Siodlarz, a physiatrist, who administered an epidural

steroid injection on April 18.  AR 318–22.  On May 6, Joseph H. reported significant

improvement in his lower back pain but that he remained unable to work. AR 323. Dr. Siodlarz then performed a right S1 transforaminal epidural steroid injection on May 14. AR 324–25. But after Joseph H. reported on June 10 that he had no improvement after the second epidural injection, Dr. Siodlarz decided to hold off on a third epidural injection and instead continue with a home exercise program and a combination of medications. AR 326–27. On July 10, Joseph H. reported a worsening of symptoms, for which Dr. Siodlarz prescribed steroids. AR 329–30. On August 28, after Joseph H. indicated he did not want any further injections, Dr. Siodlarz opined that Joseph H. could not perform his job because of "his subjective complaints of pain with activity." AR 332–33. On November 1, Dr. Ibrahim Alghafeer, a rheumatologist, saw Joseph H. and did not observe any signs of ankylosing spondylitis or other forms of inflammatory spondyloarthropathies. AR 364–65.

On March 18, 2014, Joseph H. saw Dr. Christopher Faubel, another physiatrist, who determined that Joseph H. would benefit from a diagnostic medial branch block to determine whether his pain was coming from the lumbar facet joints. AR 442. Joseph H. received a first set of these lumbar medial branch blocks on March 26 and reported that they brought him to eighty percent for three and a half hours. AR 438–39. This allowed Joseph H. to rake the yard and do other activities around the house, but the increased activities also caused muscle achiness. AR 438. On April 2, Joseph H. received another set of lumbar medial branch blocks, reporting complete relief that lasted into the following day and allowed him to do work around the house. AR 436–37. On April 9, Joseph H. underwent a lumbar medial branch radiofrequency ablation, after which he reported feeling "phenomenal for a while" until he experienced severe left-sided sacroiliac area pain after attempting farm work. AR 433, 435. Joseph H. reported the pain was sharp and became worse when sitting, standing, and leaning forward but better when lying down

with his knees bent.  AR 433.  Dr. Faubel then gave him a left sacroiliac joint and sacral muscle injection on May 7, which he reported did not provide any real relief.  AR 481, 483.  On June 6, Joseph H. received a left piriformis injection.  AR 479.  On June 26, Joseph H. reported that he experienced significant pain when helping a friend do some work earlier that month but that, overall, the injections had significantly helped his left buttock pain.  AR 477.  On August 7, Joseph H. again reported that he felt much worse after helping someone do some work.  AR 475.  Dr. Faubel noted that the pain appeared to be back on both sides, did not appear to be coming from the L5-S1 disc protrusion, and should not be coming from the lumbar facet joints.  AR 475.  Dr. Faubel ordered a functional lift test to obtain objective data on Joseph H.'s ability to work.  AR 475–76.  Joseph H. performed the test on August 13, which demonstrated that Joseph H. could not perform the functional requirements of his prior job.  AR 493.

On August 26, Dr. Thornton completed forms attesting to Joseph H.'s complete disability.  AR 495–97.  In September and November, Dr. Thornton noted that Joseph H. was "[i]n obvious pain" and could not sit still for more than five to ten minutes.  AR 508, 511.  On March 30, 2015, Joseph H. complained to Dr. Thornton that his back hurt all the time and that he had approximately two to three really bad days each month.  AR 689.  Dr. Thornton observed Joseph H.'s stiffness and obvious pain and prescribed an additional painkiller, which Joseph H. reported helped alleviate his back pain.  AR 684, 691.

On July 23, Joseph H. returned to see Dr. Popp, reporting that the nerve cauterization Dr. Faubel performed did not provide him with significant long-term relief and that, when he tried to return to work, he could not do much of significance.  AR 593.  X-rays showed air disc phenomenon at L5-S1.  AR 596.  Given his examination and the x-rays, Dr. Popp opined that Joseph H. was totally disabled and would have difficulty with sedentary work because of his

medications.  AR 596.  But on August 5, Dr. Thornton noted that Joseph H. reported that he could manage his pain given the current treatment plan.  AR 674.

Joseph H. had a bone scan on August 4, which indicated some increased activity at L5-S1, which favored activity related to degenerative facet hypertrophic changes and discogenic degenerative change.  AR 598–99.  Joseph H.'s August 28 MRI indicated mild disc degeneration and posterior bulging at L2-L3 and L3-L4; mild disc desiccation and moderately prominent diffuse bulging extending into the neural foramina slightly greater on the right, as well as a small annular fissure, at L4-L5; and disc degeneration with significant loss of height and signal intensities, as well as broad-based disc osteophyte complex with extension into the neural foramina, slight impingement on the right S1 nerve root, and mild to moderate bilateral foraminal stenosis without impingement upon exiting L5 nerve roots at L5-S1.  AR 601.  The degenerative changes appeared similar to his prior 2013 MRI.  AR 601.  On September 1, Dr. Popp noted that Joseph H. had "failed all conservative type of treatment" and suggested a discogram to "better elucidate possible pain generators on him."  AR 612, 615.  Joseph H.'s October 23 discogram revealed moderate to severe discordant pain at L3-L4, L4-L5, and L5-S1. AR 761.  His CT scan, performed the same day, revealed mild disc bulging at L2-L3 and L3-L4. AR 764.  At L4-L5, he had moderately prominent diffuse bulging extending into the neural foramina slightly greater on the right, and at L5-S1, he had prominent narrowing of the disc, distribution of contrast compatible with degeneration and multiple annular tears, broad-based disc osteophyte complex narrowing the right lateral recess, mild bilateral foraminal narrowing, and mild central stenosis.  AR 763–64.  After reviewing these test results, on November 10, Dr. Popp recommended against surgical intervention because he did not think it would predictably

improve his function and instead suggested remaining conservative and keeping up with physical therapy exercises. AR 773.

In February 2016, Joseph H. told Dr. Thornton that the back surgeon could not do anything further. AR 837. In April 2016, Joseph H. threw out his back and reported excruciating pain. AR 832. In August 2016, Joseph H. reported to Dr. Thornton that his back was better overall despite some bad days. AR 827.

Although he had not seen Joseph H. since August 2014, Dr. Faubel completed a musculoskeletal defects report on October 5, 2015. AR 759. Dr. Faubel indicated he could not determine Joseph H.'s functional ability to work or his likelihood to be absent from work, but he reported that, as of August 2014, Joseph H. had constant pain in his lower back, which increased with sitting, standing, walking, flexion, and extension. AR 758–59.

In September 2016, Dr. Popp completed a musculoskeletal defects report, indicating Joseph H. suffered from constant severe pain in his lower back. AR 856. He opined that Joseph H.'s pain was reasonably related to his impairments and that his fatigue and pain frequently impacted his concentration and attention. AR 857. Dr. Popp estimated that Joseph H. would be absent from work more than three times per month due to his impairments. AR 858.

### B.    Mental Impairments

On May 1, 2013, Dr. Diana Kraft saw Joseph H. for a psychiatric evaluation. AR 370. Joseph H. reported he had developed depression and experienced panic attacks once or twice a day because of his back pain, inability to work, and the resultant financial pressures. AR 370. He reported feeling down, losing interest in things he previously enjoyed, trouble falling asleep, feeling restless, worthless, and guilty, and having difficulty concentrating and making decisions. AR 370. He also indicated he had anxiety when leaving the house. AR 370. Dr. Kraft noted

that Joseph H. appeared overtly anxious, fidgeting and holding himself tensely. AR 371. She diagnosed him with major depression, single episode, and panic disorder with agoraphobia, and prescribed him medication. AR 371. Although Joseph H. reported feeling less depressed when he next saw Dr. Kraft on May 28, he continued to have one to two panic attacks each day, feel anxious, and have trouble concentrating and sleeping. AR 373. In June, Dr. Kraft noted that Joseph H.'s panic attacks had decreased in frequency to about once per week but that his anxiety "waxes and wanes." AR 375. She assessed that Joseph H. also suffered from fairly significant social anxiety. AR 375. On August 1, Joseph H. reported to Dr. Kraft that he was "very shaky and anxious," although his depression had lifted. AR 377. In addition to added medication, Dr. Kraft instructed Joseph H. to taper off of caffeine and start relaxation exercises. AR 377–78. On September 9, Joseph H. reported to Dr. Kraft that he was doing better, had reduced his caffeine intake, and had panic attacks about once a week at most. AR 379. On November 4, Dr. Kraft recorded that Joseph H.'s panic attacks were under good control, but that he reported difficulties paying for his medication. AR 381. Joseph H. next saw Dr. Kraft on February 6, 2014, reporting that although his panic attacks were generally under control, he was feeling frustrated because his back pain was preventing him from working and he was under great financial stress. AR 383. On June 11, Joseph H. reported feeling more depressed and frustrated by his inability to do physical labor. AR 452. At that time, Dr. Kraft recorded that, while Joseph H. had constant stress about finances, he was not experiencing panic attacks. AR 452. She included a diagnosis of alcohol abuse and recommended that he limit his alcohol use. AR 452–53. On July 21, Dr. Kraft noted that Joseph H.'s depression, panic disorder, and social anxiety appeared to be worsening, potentially because Joseph H. could not afford his medication. AR 454. On August 25, Joseph H. told Dr. Kraft that he was struggling, hopeless, and wanted to run away. AR 456.

On September 22, Dr. Kraft noted that, despite some improvement, Joseph H. continued to look like he was in pain. AR 458. On November 25, Joseph H. complained to Dr. Kraft of having memory issues and "feeling a little foggy." AR 460. During his next visit on January 19, 2015, he reported his panic attacks were generally under control with the aid of medication. AR 462. Dr. Kraft noted her concern that the medications could cause his excessive sleepiness. AR 462. On March 23, Joseph H. told Dr. Kraft he was having many panic attacks after he returned to drinking caffeine. AR 524. He reported having little interest in doing things, feeling hopeless, and sleeping either too much or too little. AR 524. Joseph H. presented at his April 13 appointment as in a lot of pain, having a hard time sitting still, angry, and frustrated. AR 705. Dr. Kraft noted that he continued to struggle with panic attacks, depression, loss of interest, low energy and appetite, and difficulty concentrating. AR 705. During his May 18 visit, Dr. Kraft noted Joseph H. did not appear as frustrated or upset and reported feeling a little better. AR 703. But the next month, Joseph H. reported he still struggled with depression, was in pain all the time, and had disrupted sleep. AR 701. In August, Joseph H. reported feeling less anxious and better rested. AR 699. On September 21, Joseph H. reported that he had had panic attacks throughout the previous day and that he had not taken some of his medications for approximately three months. AR 697. Dr. Kraft observed that he looked "very sad with very low energy" and also was "a little bit shaky." AR 697. He improved somewhat over the next several months, AR 785, 787, until he complained of increased panic attacks and difficulty sleeping in February 2016, AR 783. On April 13, Joseph H. reported having panic attacks about four times a week. AR 781. On June 14, Dr. Kraft noted that Joseph H.'s panic attacks "wax and wane" but generally were under control. AR 779. But when Joseph H. saw Dr. Kraft on July 25, he indicated he had at least one panic attack each day, was shaking, and having difficulty

concentrating.  AR 777.  On August 15, Joseph H. indicated that, with additional medication, he did not feel as anxious, panicky, or shaky but continued to be fatigued.  AR 775.

Beginning in September 2014, Joseph H. saw therapist Mary McKinnell in addition to Dr. Kraft.  AR 587.  Like Dr. Kraft's treatment notes, her reports reflect a similar pattern of waxing and waning symptoms of depression and anxiety.  In February and March 2015, Joseph H. reported increased anxiety that kept him from leaving the house, as well as the fact that he did not frequently shower or change his clothing.  AR 559, 561, 563.  But by the end of March and into early April, McKinnell noted improving mood and better hygiene and self-care, due in part to a change in medication.  AR 555, 557.  Her April 13 notes reflect that Joseph H. appeared angry and agitated that day, struggling with life stressors.  AR 553.  But again in May, June, and July, Joseph H. reported an improved mood and decreasing anxiety symptoms.  AR 717, 721, 723, 727, 729.  This changed in September after Joseph H. learned he would never return to his prior masonry work, prompting McKinnell to discuss the possibility of different treatment options, such as inpatient care.  AR 713.  Joseph H. declined such options, despite being more fidgety than normal and shaky, and refusing to leave the house unless necessary.  AR 709, 711, 822.  After increasing his pain medications, on October 19, Joseph H. reported an improved mood.  AR 820.  This cycle continued into 2016, with periods of increased anxiety, shaking, and depression, *see, e.g.*, AR 791, 795, 797, 807, and other periods of improvement, *see, e.g.*, AR 803.

Dr. Kraft completed a psychiatric report on February 9, 2015, reflecting her diagnosis that Joseph H. suffered from major depression and panic disorder.  AR 448.  Despite medication and weekly psychotherapy, Dr. Kraft noted that Joseph H. remained fatigued, depressed, anxious, and had difficulty concentrating.  AR 450.  She assessed that he had serious limitations

in independently initiating, sustaining, or completing tasks, as well as understanding, carrying out, and remembering instructions on a sustained basis. AR 450. She opined he also had serious limitations in responding appropriately to supervision, coworkers, and customary work pressures, noting that Joseph H. became very anxious. AR 450. She also indicated his pain and medications would limit his ability to perform tasks on a sustained basis without undue interruptions or distractions. AR 451.

On September 23, 2015, Dr. Kraft completed a mental Residual Functional Capacity ("RFC") statement. AR 696. Based on his major depression, panic disorder, and social anxiety disorder, she assessed that Joseph H.'s memory and understanding abilities, as well as his abilities to carry out detailed instructions, perform activities within a schedule, maintain regular attendance, and complete a normal workday and workweek without interruptions from psychologic symptoms and perform at a consistent pace without an unreasonable number and length of breaks would preclude performance for fifteen percent or more of an eight-hour workday. AR 693–694. She noted Joseph H. had poor concentration, overwhelming anxiety, and pain significantly exacerbated by his depression and anxiety. AR 695. She assessed that Joseph H.'s limitations would preclude him from performing his job more than thirty percent of an eight-hour workday, five days per week, and would cause him to be twenty percent as efficient as an average worker. AR 695. She also estimated he would be absent more than six days a month as a result of his impairments and could not obtain and retain work in a competitive work environment. AR 695–96. Dr. Kraft completed an additional mental RFC statement on September 6, 2016, with many of the same findings and reiterating that, because of his limitations, Joseph H. could not obtain and retain work in a competitive work environment. AR 846–49.

McKinnell also completed a report on September 24, 2015, in which she noted that Joseph H.'s anxiety made it difficult for him to interact with others and that coping with supervisors, co-workers, the public, stress, family, and travel all triggered his symptoms. AR 755–56. She also indicated his panic, anxiety, depression, and chronic pain made it challenging and at times impossible for Joseph H. to sustain concentration and attention. AR 756. Despite this, she opined that Joseph H. could function in a competitive work setting with a regular work schedule. AR 756. In contrast to this report, in a September 8, 2016, report, McKinnell indicated that Joseph H. could not function in a competitive work environment, noting his depression and anxiety affected his ability to complete tasks, focus, and concentrate. AR 851.

### C.    Function Reports

Joseph H. and his wife completed function reports in June 2014. Joseph H. reported that lifting caused him the most pain and prevented him from working because no light duty existed in his masonry job. AR 223. Joseph H.'s wife considered Joseph H. to be mostly homebound. AR 216. He indicated that he mostly watched television throughout the day and also took care of his dog. AR 224. Joseph H.'s wife noted that although he performed some household chores like folding his laundry and loading the dishwasher, he needed constant directions for things he previously could do on his own. AR 214. He also did not change his clothes frequently, found it hard to reach his back when bathing, and did not cook as frequently. AR 224–25. He reported he did not like driving and only did so to doctors' appointments. AR 226. He could not fly fish, bow hunt, or garden any longer. AR 227. He estimated he could lift ten pounds at most, kneel for less than a minute, sit for ten minutes at a time, and pay attention for ten to twenty minutes at a time. AR 228. He thought he could get along with authority figures "really well" and could handle changes in routine. AR 229.

Joseph H. and his wife completed updated function reports in February 2015. His wife noted that his depression and anxiety caused him to sleep excessively and stay in the house because of "irrational thoughts and anger issues." AR 254. She indicated he was "exhausted virtually all of the time" and had disrupted sleep because of his back pain. AR 255. Any movement requiring use of his back caused him pain, and he also reported shooting pain down his right leg if he tried to carry bags, groceries, laundry, or the trash. AR 259, 274. Joseph H. reportedly continued to ignore personal hygiene, refusing to shower and shave until his wife insisted. AR 255. At this time, Joseph H. no longer prepared any of his own meals or drove. AR 256–57. His wife indicated he had "deplorable" memory, rarely completed tasks, and had difficulty concentrating for more than ten minutes at a time. AR 261. Joseph H.'s wife described him as "argumentative, belligerent, and passive aggressive" with her and resistant to social interaction, including family holiday celebrations. AR 259. Indeed, Joseph H. stated that "[e]veryone is annoying or I am annoying. I don't know which one," and that he did not "like going anywhere anymore" and did not "like people." AR 270. He reported "everything seems bad and like a very big deal now . . . . wrong all the time," and that he had developed "an overwhelming sense of fear." AR 271.

## III.    Disability Hearing

### A.    Joseph H.'s Testimony

At the October 20, 2016, hearing, Joseph H. testified that, as a mason, he was constantly on his feet and lifting up to ninety-five pounds at a time. AR 59. He testified that his back problems became worse over time. AR 59. Although he received some relief from two Cortisone shots, he did not see the benefit to additional shots, particularly given their cost. AR 59. He claimed the cauterization treatment helped for a week, but that, when he tried helping a

cousin remodel a house, he could only take about three hours of work before having to stop. AR 60. Joseph H. described his pain felt like "a knife shoved in [his] back and somebody twist[ing] and yanking it." AR 60. He indicated he had pain mainly in his lower back, although it sometimes traveled down his right leg, stopping at his knee. AR 60. He acknowledged that the pain came and went but that he could only stand and sit comfortably for fifteen to twenty minutes at a time. AR 60–61. He also indicated he had difficulty sleeping because of the pain. AR 61.

Joseph H. also testified that he began experiencing bad anxiety, including panic attacks, several weeks after he stopped working. AR 62. At the time of the hearing, he claimed to have at least two severe panic attacks a week and that his mind constantly races. AR 62–63. He also testified he suffered from depression, having difficulty getting out of bed and caring about his personal hygiene. AR 61–62. He usually dressed in pajamas, changing once a week, but had "dressed up" for the hearing in a sweatshirt and sweatpants. AR 63. He denied doing much around the house and indicated he only left the house once a week for therapy. AR 64. He mainly spent his time watching tv, lying down, and moving around to alleviate his pain. AR 65–66. He was also watching his twelve-year old nephew for about an hour each day, which mostly involved telling the nephew to do his homework. AR 66. He acknowledged having a history of heavy drinking but claimed to have only a beer every two weeks or so. AR 67. He also admitted to marijuana use when he could not sleep. AR 67. He claimed constipation as a side effect of his medication, and noted that he also suffered from involuntary muscle movements, forgetfulness, and difficulty concentrating. AR 67.

## B.    Medical Expert Evidence

On July 25, 2014, Dr. Robert Watson, Psy.D., performed a mental status evaluation for the Bureau of Disability Determination Services. AR 464. Dr. Watson assessed Joseph H. to have expected cognitive function but emotional functioning and psychological symptoms consistent with moderate depression without psychotic features and moderate levels of anxiety with features of generalized anxiety and panic disorder. AR 468. Dr. Watson also determined that Joseph H. had mild-to-moderate features of avoidant personality. AR 468. Reviewing this and other evidence in the record, Dr. Loretta McKenzie, Psy.D., then concluded that Joseph H. did not have a serious mental impairment. AR 80.

On March 19, 2015, Dr. Glen Wurglitz, Psy.D., performed another psychological evaluation. AR 518. Dr. Wurglitz determined that Joseph H. suffered from a panic disorder and major depressive disorder, recurrent episode, moderate. AR 521–22. He concluded Joseph H.'s prognosis was "moderately guarded due to the chronicity and severity of his back pain, and his recurrent depression." AR 522. Dr. David Voss, Ph.D., then evaluated the evidence in the record at the reconsideration level on March 23, 2015. AR 93. He concluded that the evidence suggested Joseph H. had more than non-severe limitations. AR 95. In performing a mental RFC assessment, Dr. Voss concluded that Joseph H. did not have understanding and memory limitations but did have sustained concentration and persistence limitations, being moderately limited in the ability to carry out detailed instructions, maintain attention and concentration for extended periods, and complete a normal workday and workweek without interruption from psychologic symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. AR 98–99. Dr. Voss also found Joseph H. moderately limited in the ability to interact appropriately with the general public. AR 99.

Dr. Ernst Bone completed a physical RFC assessment on July 29, 2014. AR 83. Dr. Bone determined that, due to Joseph H.'s reduced range of motion and moderate to marked loss of disc height at the L5-S1 level, he could engage only in light work activity. AR 78–79. Dr. Bone concluded that Joseph H. could occasionally lift or carry twenty pounds and frequently lift or carry ten pounds, and had no other restrictions on pushing or pulling. AR 82. He opined Joseph H. could both sit and stand for about six hours in a workday, occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, but that he could not climb ladders, ropes, or scaffolds. AR 82. Dr. Bone did not impose any manipulative, visual, communicative, or environmental limitations. AR 83.

Dr. Calixto Aquino performed a physical RFC assessment at the reconsideration level on March 26, 2015, concluding that Joseph H. could occasionally lift or carry twenty pounds and frequently lift or carry ten pounds, and had no other restrictions on pushing or pulling. AR 97. He opined Joseph H. could both sit and stand for about six hours in a workday. AR 97. Dr. Aquino determined that Joseph H. could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, but that he could not climb ladders, ropes, or scaffolds. AR 97. Dr. Aquino did not impose any manipulative, visual, communicative, or environmental limitations. AR 97.

At the hearing, Dr. James M. McKenna testified to Joseph H.'s physical impairments. He acknowledged Joseph H. suffered from degenerative disc disease that was advanced for his age but considered Joseph H.'s pain to be "out of proportion to the objective medical evidence in the file." AR 50, 55, 57. He noted that Joseph H. did not seem to respond to any medical modality, AR 54, and questioned Dr. Popp's conclusion that Joseph H.'s symptoms did not warrant surgery, AR 55. As for an RFC, Dr. McKenna observed that Joseph H. had an annular tear,

which limited Joseph H. to light loads, with lifting of up to twenty pounds occasionally and ten pounds frequently.  AR 50–51, 56.  The annular tear also warranted excluding long ladders, ropes, and scaffolds, while allowing for five or six inch step ladders, ramps, or stairs on an occasional basis.  AR 56.  Dr. McKenna opined that Joseph H. could balance frequently and stoop, crouch, kneel, and crawl occasionally.  AR 56.  He considered reducing the gross manipulation to frequent and avoiding concentrated exposure to extreme cold or vibration as concessions to Joseph H.'s pain.  AR 57.   He also suggested avoiding unprotected heights and exposure to dangerous machinery.  AR 57.  Because Dr. McKenna did not find clear evidence of focal neurological findings or a positive EMG, he opined that Joseph H. could sit, stand, or walk for six hours of a workday, without restrictions on pushing and pulling or the use of foot controls.  AR 56.  Dr. McKenna acknowledged that physical activity could cause an increase in Joseph H.'s pain, that severe pain can affect an individual's concentration and attention, and that chronic pain can exacerbate or contribute to psychiatric impairments.  AR 57–58.

### C.      Vocational Expert Evidence

Glee Ann L. Kehr testified that Joseph H.'s prior work as a masonry laborer, which involves heavy and semi-skilled work.  Considering a hypothetical individual, younger in age with a high school education and prior work as a construction worker, limited to light work with the restrictions described by Dr. McKenna, as well as with moderate social functioning, moderate concentration, persistence, or pace, severe obsessive decompensation requiring simple routine work with only occasional interaction with the public, coworkers, and supervisors, with variable rate and pace type work that did not allow for assembly line work or commercial driving, Kehr opined that the individual could not perform Joseph H.'s past work.  AR 68–69.  Kehr indicated such a person could instead perform light, unskilled, SVP:2 work as a

housekeeper, a mailroom clerk, and a merchandise marker.  AR 69.  Adjusting the hypothetical

to require sedentary exertional level work, Joseph H. could perform sedentary, unskilled, SVP:2

work as an address clerk, an account clerk, or a bench sorter.  AR 69–70.  If the individual had

moderate to marked concentration so that the individual was off-task mentally or physically

twenty percent of an eight-hour workday, Kehr opined this would preclude all competitive work

at all exertional levels, with no more than fifteen percent off-task time allowable to sustain

simple, unskilled competitive work.  AR 70.  She testified that an individual requiring two

additional fifteen-minute rest breaks, on top of regularly scheduled breaks, would not be

conducive to employment.  AR 71.

## IV.    The ALJ's Decision

Following the five-step analysis used by the Social Security Administration to evaluate

disability, the ALJ found at step one that Joseph H. had not engaged in substantial gainful

activity since February 28, 2013.  AR 12.  At step two, the ALJ determined that Joseph H.'s

degenerative disc disease of the lumbar spine, severe major depression, and panic disorder

constituted severe impairments.  AR 12.  Despite finding at step two that Joseph H. had several

severe impairments, at step three the ALJ found that the severity did not meet or equal any of the

listed impairments in 20 C.F.R. Part 404, Subpart 4, Appendix 1.  AR 12–20.

After reviewing the record, the ALJ found that Joseph H. had the RFC to perform light

work.  AR 20.  She imposed the following non-exertional limitations: occasional lifting and/or

carrying of a maximum of twenty pounds; frequent lifting and/or carrying of a maximum of ten

pounds; walking and/or standing for six hours of an eight-hour workday; sitting for six hours of

an eight-hour workday; and pushing and/or pulling, including operation of hand or foot controls

with his bilateral upper and lower extremities.  AR 20.  She also imposed the following postural

limitations: no climbing of ropes, scaffolds, or long ladders; occasional climbing of stepladders of no more than five or six steps, ramps, or stairs; frequent balancing; and occasional stooping, crouching, kneeling, or crawling.  AR 20.  She allowed for frequent gross manipulation with the bilateral upper extremities.  AR 20.  As for environmental limitations, Joseph H. was to avoid all exposure to unprotected heights and dangerous machinery; do no commercial driving; and avoid concentrated exposure to extreme cold or vibration.  AR 20.  Finally, the ALJ limited Joseph H. to simple routine work that allowed for a variable work pace, excluding machine-set pace or assembly line pace, with the work requiring no more than occasional contact with the public, co-workers, and supervisors.  AR 21.

In reaching this RFC, the ALJ found it reasonable that Joseph H.'s medically determinable impairments could cause his symptoms but determined that his statements about the intensity, persistence, and limiting effects of his symptoms were not consistent with the medical and other evidence in the record.  AR 21–22.  The ALJ gave great weight to Dr. McKenna's assessment, noting that he had familiarity with the Social Security Administration's policies and regulations, had reviewed the entirety of the evidence in reaching his RFC assessment, and had supported his opinion by referencing medical evidence.  AR 23.  The ALJ gave some weight to Dr. Bone and Dr. Aquino's opinions but noted that the evidence at the hearing suggested Joseph H. required additional non-exertional limitations.  AR 23.  The ALJ gave no weight to Dr. McKenzie's evaluation that Joseph H. did not have a severe mental impairment, but she gave some weight to Dr. Voss' evaluation while indicating that the evidence at the hearing suggested additional social functioning limitations.  AR 23.  The ALJ gave some weight to Dr. Kraft's opinions to the extent consistent with treatment records but gave no weight to Dr. Kraft's opinions on the limitations on Joseph H.'s work-related functioning because "she

did not describe how his impairments would limit" him. AR 24. The ALJ also gave little weight to Dr. Kraft's mental RFC statements, concluding that Dr. Kraft assessed Joseph H. to have greater limitations than her treatment notes supported. AR 24. The ALJ also gave no weight to Dr. Kraft's conclusion of disability, faulting Dr. Kraft for not explaining how Joseph H.'s mental impairments limited him. AR 24. The ALJ gave little weight to McKinnell's reports and session notes based on the fact that McKinnell often repeated the same statements. AR 24. The ALJ also did not take into account McKinnell's reports on the issue of disability because she did not qualify as an acceptable medical source. AR 25. The ALJ did not give any weight to Dr. Thornton's evaluation of complete disability because it did not include any explanation or to Dr. Faubel's report because he had not examined Joseph H. for over a year when he completed it. AR 25. Finally, the ALJ gave some weight to Joseph H.'s wife's reports. AR 25.

Based on these findings and the RFC, the ALJ found at step four that Joseph H. could not perform his past work as a masonry laborer or construction worker. AR 25. The ALJ then proceeded to step five and concluded that Joseph H. could work in light exertional occupations in housekeeping or as a mail room clerk or merchandise marker and so is not disabled. AR 26–27.

## LEGAL STANDARD

### I.    Standard of Review

In reviewing the denial of disability benefits, the Court "will uphold the Commissioner's final decision if the ALJ applied the correct legal standards and supported her decision with substantial evidence." *Bates v. Colvin*, 736 F.3d 1093, 1097 (7th Cir. 2013). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (citation omitted) (internal quotation marks omitted). Although the Court reviews the entire

record, it does not displace the ALJ's judgment by reweighing facts or making independent credibility determinations. *Beardsley v. Colvin*, 758 F.3d 834, 836–37 (7th Cir. 2014). But reversal and remand may be required if the ALJ committed an error of law or the decision is based on serious factual mistakes or omissions. *Id.* at 837. The Court also looks to "whether the ALJ built an 'accurate and logical bridge' from the evidence to her conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). "[H]e need not provide a complete written evaluation of every piece of testimony and evidence," *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012) (quoting *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005)), but "[i]f a decision 'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required," *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

## II. Disability Standard

To qualify for DIB, a claimant must show that she is disabled, i.e. that she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Weatherbee v. Astrue*, 649 F.3d 565, 568 (7th Cir. 2011). To determine whether a claimant is disabled, the Social Security Administration uses a five-step sequential analysis. 20 C.F.R. § 404.1520; *Kastner*, 697 F.3d at 646. At step one, the ALJ determines whether the claimant has engaged in substantial gainful activity during the claimed period of disability. 20 C.F.R. § 404.1520(a)(4)(i). At step two, the ALJ considers whether the claimant's physical or mental impairment is severe and meets the twelve-month durational requirement. 20 C.F.R.

§ 404.1520(a)(4)(ii). At step three, the ALJ determines whether the claimant's impairment(s) meet or equal a listed impairment in the Social Security regulations, precluding substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(iii); 20 C.F.R. Pt. 404, Subpt. P, App. 1. If the claimant's impairment(s) meet or medically equal a listing, the individual is considered disabled; if not, the analysis continues to step four. 20 C.F.R. § 404.1520(a)(4)(iii). At step four, the ALJ assesses the claimant's RFC and ability to engage in past work. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant can engage in past relevant work, she is not disabled. *Id.* If she cannot, the ALJ proceeds to step five, in which the ALJ determines whether a substantial number of jobs exist that the claimant can perform in light of her RFC, age, education, and work experience. 20 C.F.R. § 404.1520(a)(4)(v). An individual is not disabled if she can engage in other work. *Id.* The claimant bears the burden of proof on steps one through four, while the burden shifts to the government at the fifth step. *Weatherbee*, 649 F.3d at 569.

## ANALYSIS

Joseph H. argues that the ALJ committed several errors in concluding that he could sustain competitive work, despite the fact that all of his treating doctors disagreed, specifically that (1) the ALJ improperly dismissed the opinions of his treating health professionals; (2) the ALJ did not accommodate all of his limitations, when considered in combination, in the RFC; and (3) the ALJ improperly concluded that Joseph H.'s statements were not consistent with the record.

The Court need only address Joseph H.'s first argument regarding the ALJ's consideration of the treating health professionals' opinions. The ALJ must give a treating physician's opinion "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence"

in the record.  20 C.F.R. § 404.1527(c)(2).[2] The ALJ must support her conclusion about the weight given to a treating physician's opinion with "good reasons," *id.*, and if she does not afford the opinion controlling weight, "the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion," *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009).

Joseph H. complains that, in refusing to give Dr. Kraft's opinion controlling weight, the ALJ did not mention the length, nature, and extent of his treatment relationship with Dr. Kraft. He also argues that the ALJ improperly discounted Dr. Kraft's opinions as inconsistent with the treatment notes.  Taking the second argument first, the Court agrees that the ALJ improperly cherry-picked the evidence, focusing on the treatment records that showed improvement, despite the fact that the records as a whole demonstrate that Joseph H.'s symptoms waxed and waned, continuing to greatly impact his life even while controlled by medication.  *See Gerstner v. Berryhill*, 879 F.3d 257, 261–62 (7th Cir. 2018) (ALJ improperly fixated on select parts of treatment notes suggesting improvement and ignored the doctor's diagnoses and continuing negative findings); *Meuser v. Colvin*, 838 F.3d 905, 912 (7th Cir. 2016) ("This 'cherry-picking' is especially problematic where mental illness is at issue, for 'a person who suffers from a mental illness will have better days and worse days, so a snapshot of any single moment says little about [his] overall condition.'" (alteration in original) (quoting *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011))).  The treatment record did show some improvement in Joseph H.'s symptoms when he was compliant with his medications.  *See, e.g.*, AR 699, 785, 787.  But at the same time, Dr. Kraft continued to observe that Joseph H. looked depressed and had a blunted affect, as well

_____

[2] The regulations concerning the evaluation of opinion evidence were amended for claims filed after March 27, 2017.  But because Joseph H. filed his claim before March 27, 2017, the treating physician rule applies to his claim.  *See* 20 C.F.R. § 404.1527.

as social anxiety causing him to avoid people and stay at home during the day.  AR 775.  In discounting Dr. Kraft's opinions of Joseph H.'s limitations, the ALJ improperly substituted her own judgment for that of Dr. Kraft, Joseph H.'s treating psychiatrist, to conclude that Joseph H. showed marked improvement with medication and that those notes contradicted Dr. Kraft's opinions.  *See Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings."); *Diaz v. Berryhill*, No. 15 C 11386, 2017 WL 497768, at *4 (N.D. Ill. Feb. 7, 2017) ("It is well-settled that treating physicians are in the best position to interpret their own clinical findings."). Moreover, the ALJ faulted Dr. Kraft for not providing specific explanations of how Joseph H.'s impairments limited him, but no function-by-function analysis was required and many of the questions on the assessment forms did not invite further explanation.  *See Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010) (noting that the questionnaire concerning claimant's limitations did not "invite further explanation or include space for comments," and that, "[a]lthough by itself a check-box form might be weak evidence, the form takes on greater significance when it is supported by medical records"); *Byndum v. Berryhill*, No. 17 C 01452, 2017 WL 6759024, at *3 (N.D. Ill. Dec. 15, 2017) ("[T]he governing regulations do not require a treating physician to submit a function-by-function assessment of a patient as part of his opinion, and dismissing a treating physician's opinion for that reason is inappropriate.").

Even if the Court concluded that the ALJ articulated good reasons not to give controlling weight to Dr. Kraft's opinions, the ALJ still erred by failing to address the factors enumerated in 20 C.F.R. § 404.1527(c) (requiring ALJ to determine the weight to give a non-controlling treating physician's opinion by considering the treatment relationship's length, nature, and extent, the consistency of the opinion, the support for the opinion, and the treater's specialty).

Although the ALJ mentioned that Dr. Kraft was Joseph H.'s treating psychiatrist, she did not mention that she was the only psychiatrist to treat Joseph H., that she saw him over the course of over three years, at times every month, or the consistency of her opinions with those of other treating, examining, and reviewing medical sources.  *See Gerstner*, 879 F.3d at 263 (finding error where ALJ gave treating source's opinion little weight without addressing the factors under 20 C.F.R. § 404.1527(c)).  This is not a case like *Schrieber v. Colvin*, where the ALJ's decision made clear that he considered the factors when determining the weight to give a treating physician's opinion despite not mentioning each factor.  *Cf.* 519 F. App'x 951, 959 (7th Cir. 2013) ("[W]hile the ALJ did not explicitly weigh each factor in discussing Dr. Belford's opinion, his decision makes clear that he was aware of and considered many of the factors, including Dr. Belford's treatment relationship with Schrieber, the consistency of her opinion with the record as a whole, and the supportability of her opinion.").  Therefore, the ALJ's treatment of Dr. Kraft's opinion alone requires remand.

Additionally, Joseph H. complains that the ALJ gave little weight to his treating therapist's reports, stating that she discounted them because McKinnell repeated the same statements from visit to visit.  Having reviewed McKinnell's notes, although certain statements remained consistent from visit to visit, McKinnell also recorded specific concerns Joseph H. presented to her at each visit.  *See, e.g.*, AR 557 (March 30, 2015, assessment of improving mood and better self-care), AR 553 (April 13, 2015, assessment that Joseph H. appeared angry and agitated), AR 709 (September 23, 2015, assessment of decreased mood, increased fidgeting, and shaking).  A closer reading of her notes, therefore, does not support the ALJ's rationale for giving them little weight, that "no matter what the claimant discussed with the therapist, she repeated the same statements in her assessment of the claimant and in the 'Patient emotional

status comment' section, including the earliest notes available for review." AR 24. Further, the fact that McKinnell does not qualify as an acceptable medical source should not have caused the ALJ to automatically give no weight to McKinnell's reports concerning Joseph H.'s disability. 20 C.F.R. § 404.1527(f); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006) (listing therapists as other sources that an ALJ may consider "to show the severity of the individual's impairment(s) and how it affects the individual's ability to function"). In fact, SSR 06-03p provides that "depending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an "acceptable medical source" may outweigh the opinion of an "acceptable medical source," including the medical opinion of a treating source." SSR 06-03p, 2006 WL 2329939, at *5. Nothing in the ALJ's decision suggests that the ALJ conducted a proper assessment of McKinnell's opinions on disability, with her instead improperly dismissing them outright based on McKinnell's status as a therapist, not a psychiatrist.

Joseph H. also complains that the ALJ did not even mention that Dr. Popp, who had treated him on and off since his back pain began, opined in August 2015 that Joseph H. was totally disabled and could not perform even sedentary work. AR 620. The treating physician rule does not require an ALJ to give controlling weight to an opinion regarding whether a claimant is disabled. 20 C.F.R. § 404.1527(d)(1) ("We are responsible for making the determination or decision about whether you meet the statutory definition of disability. In so doing, we review all of the medical findings and other evidence that support a medical source's statement that you are disabled. A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."). But the ALJ did not even mention Dr. Popp's opinion, which admittedly appeared in a treatment note instead of a

separate report.  The Commissioner argues that the ALJ did not need to mention every piece of evidence but only build a bridge between the evidence and the conclusion.  *See Simila*, 573 F.3d at 516.  Here, however, the Court finds the ALJ's analysis of Dr. Popp's opinion somewhat problematic.  In the one instance she did discuss Dr. Popp's conclusions, she did so misleadingly, noting that, in November 2015, Dr. Popp considered that surgical intervention would improve Joseph H.'s function.  AR 15.  But Dr. Popp's notes instead state "I do *not* feel a surgical intervention will predictably improve his function with three level dis-concordant pain and degenerative changes at those levels," the exact opposite of the ALJ's statement.  AR 773 (emphasis added).

Taken as a whole, these errors in considering Joseph H.'s treating health professionals' opinions require remanding the case for further consideration.  And because the Court has concluded that a remand is required, it need not address Joseph H.'s other arguments.  His remaining arguments are intertwined with the ALJ's evaluation of the medical evidence, which will be reevaluated and further explained on remand.  Therefore, the remand should also consider Joseph H.'s remaining arguments concerning the accommodation of his limitations in the RFC assessment and the consistency of Joseph H.'s statements with the medical record.

## CONCLUSION

For the foregoing reasons, the Court grants Joseph H.'s motion for summary judgment [9] and denies the Commissioner's motion for summary judgment [20].  The Court reverses the ALJ's decision and remands this case to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Opinion.

Dated: November 12, 2019

_____
SARA L. ELLIS
United States District Judge